**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| VIAMEDIA, INC., | ) | |
| | ) | |
| | ) | Case No. 1:16-cv-05486 |
| *Plaintiff*, | ) | |
| | ) | Hon. Amy St. Eve |
| v. | ) | |
| | ) | |
| COMCAST CORPORATION, and | ) | |
| COMCAST SPOTLIGHT, LP, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ...............................................................................................1

ARGUMENT...................................................................................................................6

I.      Viamedia Has Stated A Claim Under Section 2 of the Sherman Act. ...............................7

        A.      Comcast's Use of Tying And Exclusive Dealing Is Unlawful. ..............................7

        B.      Under *Aspen Skiing*, Comcast's Refusal To Deal Is Unlawful.............................10

        C.      Viamedia Has Alleged Substantial Harm To Competition....................................14

        D.      The Complaint Has No "NCC Claim" And Presents No Ripeness
                Concerns. .......................................................................................................15

II.     Viamedia Has Stated Viable Claims Under State Law.......................................................15

CONCLUSION..................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.I.B. Express, Inc. v. FedEx Corp.*,
 358 F. Supp. 2d 239 (S.D.N.Y. 2004)..................................................................................10

*Armstrong v. Daily*,
 786 F.3d 529 (7th Cir. 2015) .............................................................................................15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
 472 U.S. 585 (1985).................................................................................................10, 11, 12, 13

*Blankenship v. Pushpin Holdings, LLC*,
 2016 WL 212933 (N.D. Ill. Jan. 19, 2016) ...........................................................................1

*Broadcom Corp. v. Qualcomm Inc.*,
 501 F.3d 297 (3d Cir. 2007)..................................................................................................7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977)..............................................................................................................14

*Christy Sports, LLC v. Deer Valley Resort Co.*,
 555 F.3d 1188 (10th Cir. 2009) ...........................................................................................14

*Conley v. Nestle USA, Inc.*,
 2011 WL 332525 (N.D. Ill. Jan. 31, 2011) ..........................................................................13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
 637 F.3d 435 (4th Cir. 2011) ............................................................................................7, 9

*Endsley v. City of Chicago*,
 230 F.3d 276 (7th Cir. 2000) ................................................................................................7

*Fishman v. Estate of Wirtz*,
 807 F.2d 520 (7th Cir. 1986) .............................................................................................1, 9

*JamSports & Entm't, LLC v. Paradama Prods., Inc.*,
 336 F. Supp. 2d 824 (N.D. Ill. 2004) ...................................................................................14

*Jefferson Parish Hosp. v. Hyde*,
 466 U.S. 2 (1984)...................................................................................................................8

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)................................................................................................8, 9

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Levenstein v. Salafsky*,
  164 F.3d 345 (7th Cir. 1998) ...................................................................................13

*Schor v. Abbott Laboratories*,
  457 F.3d 608 (7th Cir. 2006) ...................................................................................10

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953)...............................................................................................7, 8

*UniStrip Techs., LLC v. LifeScan, Inc.*,
  153 F.Supp.3d 728, 741 (E.D. Pa. 2015) ..................................................................9

*United States v. Griffith*,
  334 U.S. 100 (1948)...................................................................................................9

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)...................................................................................................7

*United States v. Visa U.S.A.*,
  344 F.3d 229 (2d Cir. 2003)....................................................................................14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..............................................................................................7, 10

*WHDH-TV v. Comcast Corp.*,
  2016 WL 2858780 (D. Mass. May 16, 2016) .........................................................14

**Statutes and Rules**

15 U.S.C. § 2...............................................................................................7, 8, 9, 10

Rule 12(b)(6).................................................................................................................1

**Other Authorities**

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
  ¶ 651a (4th ed. 2015) ................................................................................................7

## INTRODUCTION

Comcast's motion to dismiss is fatally flawed for a fundamental reason: it fails to address the allegations of the Complaint. Comcast maintains, repeatedly and emphatically, that Viamedia directs its challenge to Comcast's unilateral "refus[al] to deal with a competitor" and "exercise[] [of] its right to compete." Def. Br. 1. It addresses its entire argument to those purported claims.

But as is evident from even a glance at the Complaint, that is *not* the nature of Viamedia's claims. For one, Viamedia does not compete with Comcast in the operation of Interconnects. Instead, as the Complaint alleges in detail, Viamedia challenges Comcast's exercise of its power over Interconnects to destroy competition in the *separate* market for Spot Cable Advertising representation services; its use of its monopoly power over Interconnects to force third parties to cease doing business with Viamedia, so as to obtain a monopoly for Comcast Spotlight in the market for representation services; and its acts precluding Viamedia from competing in that market. This use of "a monopoly in one market to foreclose competition in another" is "a classic violation of the antitrust laws." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986). Comcast fails even to acknowledge these allegations, let alone respond to them and show that they lack force. Likewise, Comcast fails to adequately address Viamedia's state antitrust claims, and does not dispute the validity of Viamedia's tortious interference claim. For these reasons, the motion to dismiss should be denied.

## STATEMENT OF FACTS

The Court's "analysis under Rule 12(b)(6) 'rests on the complaint, and [it] construe[s] [the complaint] in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor.'" *Blankenship v. Pushpin Holdings, LLC*, 2016 WL 212933, at *1 (N.D. Ill. Jan. 19, 2016).

Over $5.4 billion is spent annually on Spot Cable Advertising. Compl. ¶ 3. In this industry, multichannel video programming distributors ("MVPDs") earn revenue by selling advertising time—typically two to three minutes per hour—that is reserved for sale by the MVPDs, rather than the cable networks. *Id.* ¶¶ 27–29. This advertising is particularly attractive because it allows advertisers to target viewers by very specific geographic location. *Id.* ¶¶ 30–33.

Defendant Comcast Corporation ("Comcast") is the nation's largest broadcast and cable television provider by revenue. *Id.* ¶¶ 8, 24. Comcast's wholly owned subsidiary Comcast Spotlight LP ("Comcast Spotlight") is the country's largest Spot Cable Advertising Representative, controlling the Spot Cable Advertising for both itself and for competitor MVPDs with which it enters into representation agreements. *Id.* Plaintiff Viamedia, Inc. ("Viamedia") is an independent Spot Cable Advertising Representative that competes with Comcast Spotlight to represent MVPDs in the marketing and selling of their Spot Cable Advertising. *Id.* ¶¶ 9, 79. Most small and medium-sized MVPDs do not have the resources necessary to run their own in-house Spot Cable Advertising sales operations. *Id.* ¶ 71. As a result, there is a market for the provision of Spot Cable Advertising Representation services to MVPDs, in which Viamedia, Comcast Spotlight, and other firms participate. *Id.* ¶ 72.[1]

Spot Cable Advertising time can be sold to advertisers in three ways: *first*, it can be sold on a regional basis through a central clearinghouse called an Interconnect, each of which serves a single television viewing market or Designated Market Area ("DMA"); *second*, it can be sold on a national or multi-regional basis through a nationwide marketplace called National Cable Communications LLC ("NCC"); or *third*, it can be sold directly by the MVPD or its

---

[1] As detailed in the Complaint, Comcast performs multiple roles related to Spot Cable Advertising: (1) it controls the Interconnects in many key DMAs, (2) it is the majority owner and controller of NCC, (3) it sells the advertising for its more than 22 million subscriber households, and (4) it provides representation services to other MVPDs, who collectively serve roughly 13 million additional subscriber households. *See* Compl. at ¶¶ 17-19, 85-98.

representative to local advertisers. *Id.* at ¶¶ 4, 34. To remain economically viable, a seller of Spot Cable Advertising must have access to all three tiers of the sales system. *Id*. ¶¶ 28, 65–69.

Interconnects play a critical role in this system because they function as central marketplaces through which all regional Spot Cable Advertising purchases are conducted. *Id*. ¶¶ 4, 35. Interconnects were created in the 1990s as cooperative organizations among multiple MVPDs for the purpose of establishing one-stop shops for advertisers by providing the logistical and technical coordination necessary to insert and run advertisements across all of the MVPDs in a DMA. *Id.* ¶¶ 35–36. In this way, Interconnects reduce transaction costs for advertisers by allowing them to buy advertising for all subscribers in a DMA at once. *Id*. There is no substitute for the Interconnects, and accessing them is critical if an MVPD is to participate in regional advertising sales and receive the revenue from such sales. *Id.* ¶ 43.

Historically, all MVPDs and their representatives have been permitted open access to Interconnects. *Id*. ¶¶ 37–38, 101–02. To preserve competition among MVPDs and their representatives, Interconnects were designed to avoid giving preferential treatment to any single participant, and the dominant MVPD in a region was not able to exercise its influence over the Interconnect to the detriment of other participants. *Id.* ¶¶ 40–41. Interconnects maintained procedures designed to prevent discrimination among participants and/or the favoring of any MVPD or its representative at the expense of other participants in the Interconnect. *Id*. ¶ 42.

This system functioned effectively and competitively for decades, and in places where MVPDs *other than Comcast* control the Interconnect it continues to do so. *Id*. ¶ 99. Through acquisitions of other MVPDs, however, Comcast has come to control the Interconnects in 15 of the 25 most populous DMAs (and 26 of the 50 most populous DMAs) in the United States, and

with that control it has fundamentally changed the way that Interconnects operate by selectively excluding MVPDs and their representatives. *Id.* ¶¶ 10, 95–97.

For example, in June 2012, Comcast unilaterally ended the decade-long access of Viamedia's MVPD clients—Wide Open West ("WOW") and RCN Corporation ("RCN")—from the Chicago and Detroit Interconnects, and barred them from participating in regional ad sales, inflicting tens of millions of dollars in losses on WOW, RCN, and Viamedia. *Id*. ¶¶ 11–12, 110–15. Prior to this exclusion, no MVPD or representative had *ever* been deliberately removed from an Interconnect for any reason. *Id*. ¶ 116. Later, in Hartford, Connecticut, Comcast barred Viamedia client Frontier Communications from the Interconnect. *Id*. ¶ 136. And in other DMAs, Comcast has also refused Viamedia's MVPD clients access to Interconnects. *Id*. ¶¶ 11–13, 167.

There is no pro-competitive justification for excluding an MVPD or its representative from an Interconnect. *Id.* ¶¶ 39, 116. To the contrary, the more MVPDs and subscribers that participate in an Interconnect, the more valuable the Interconnect becomes for advertisers and MVPDs alike. *Id.* ¶¶ 37–39. As Comcast itself stated: "[t]he value of an interconnect increases as more MVPDs in an area participate, so our incentive is to have as many MVPDs participate as possible." *Id.* ¶ 39. Indeed, Comcast's senior executive has testified before Congress that Comcast would not exclude competitors from participating in Interconnects. *Id.* ¶¶ 117–18. Despite its representations to Congress, however, Comcast has continued to bar Viamedia's MVPD clients from accessing Interconnects. *Id.* ¶ 119–21.

When pressed to provide a reason for excluding Viamedia's MVPD clients from the Interconnects, Comcast acknowledged that the exclusion was motivated by Comcast Spotlight's desire to replace Viamedia as these clients' Spot Cable Advertising Representative. *Id*. ¶ 112. And Comcast has in fact used its ability to selectively exclude or threaten to exclude others from

4

the Interconnects—to coerce rival MVPDs, such as WOW and RCN, to end their business relationships with Viamedia and transfer business to Comcast Spotlight. *Id*. ¶ 12. Comcast explicitly informed these rival MVPDs that their access to Interconnects was contingent upon their agreement to cease transacting business with Viamedia and to deal exclusively with Comcast Spotlight. *Id*. ¶¶ 12, 112–13. But for Comcast's coercion and exclusion of these MVPDs from the Interconnects, Comcast Spotlight would not have won this business. *Id*. ¶¶ 83–84. Indeed, as RCN said a few months before it succumbed to Comcast's coercion, "RCN is not comfortable having its largest and most formidable rival as its representative in the spot cable market and should be free to choose a representative for such services that does not present such an obvious conflict and competitive disadvantage." *Id*. ¶ 108.

Comcast has also said it will not consider allowing Viamedia's clients access to the Chicago or Detroit Interconnects unless Viamedia accepts conditions that would prevent Viamedia from competing with Comcast Spotlight. *Id.* ¶ 122. For example, Comcast has conditioned access upon Viamedia granting Comcast the right to preempt, at its discretion and with virtually no notice, any Spot Cable Advertising sold or controlled by Viamedia, even if not sold through the Interconnect, rendering it impossible for Viamedia to sell to local advertisers for fear that Comcast would preempt and resell their ads. *Id*. ¶¶ 122–23.

By virtue of its exclusionary conduct, Comcast has foreclosed all competition in Spot Cable Advertising Representation to Comcast Spotlight, and secured complete monopolies over Spot Cable Advertising Representation services in all markets where it controls the Interconnect. *Id.* ¶¶ 83–84. In the Chicago and Detroit DMAs, Comcast and Comcast Spotlight now control *100 percent* of all Spot Cable Advertising sold. *Id*. ¶¶ 86–87. And Comcast is in the midst of extending its regional monopolies into national Spot Cable Advertising, by using its control of

5

NCC to shut independent advertising representatives and their clients out of that marketplace for national sales, just as it has done with Interconnects. *Id*. ¶¶ 143–53. Comcast has instructed NCC not to renew Viamedia's ability to use NCC and has approached Viamedia's remaining MVPD clients, urging them to terminate their representation agreements with Viamedia if they wish to continue to have access to NCC in the future. *Id.* As Comcast has publicly acknowledged, the U.S. Department of Justice has launched a formal investigation into whether Comcast's business practices have hindered competition in Spot Cable Advertising. *Id*. at ¶ 7.

## ARGUMENT

Notably, Comcast does not take issue with the central elements of the Complaint. It does not deny that Viamedia has properly alleged a product market in Spot Cable Advertising Representation services and geographic markets in DMAs, such as the Chicago and Detroit, where Comcast controls the Interconnect. *See* Compl. ¶ 165. Comcast does not deny that it has a monopoly over representation services in these markets, or that it has sole control over the Interconnects in numerous metropolitan areas. *See id.* ¶ 86–87, 166. Indeed, Comcast does not deny that it has acted with the *specific intent* to acquire and maintain a monopoly. *See id*. ¶¶ 14, 178. Instead, it makes a single, central contention, which it repeats metronomically throughout its brief: that refusal to deal with a rival does not violate the Sherman Act. *See* Def. Br. 1, 3, 6–8.

This argument, however, takes no account of the Complaint actually filed by Viamedia. As described above, and as is apparent from the face of the Complaint, Viamedia challenges Comcast's use of its control over Interconnects to obtain monopoly power over the separate market in representation services; the Complaint is directed at Comcast's exclusion of MVPDs from participation in Comcast-controlled Interconnects so long as they are represented by Viamedia. And *these* allegations unquestionably state a violation of the Sherman Act: it is black

letter law that, in circumstances such as those here, tying, exclusive-dealing arrangements, and refusals to deal that have no rational competitive purpose *all* are predatory and unlawful. Comcast's motion, which makes no attempt to rebut these propositions, should be denied.

## I. Viamedia Has Stated A Claim Under Section 2 of the Sherman Act.

### A. Comcast's Use of Tying And Exclusive Dealing Is Unlawful.

The legal rules that govern here are well settled. Viamedia brings its federal antitrust claims under Section 2 of the Sherman Act, which prohibits monopolization or attempted monopolization of trade or commerce. 15 U.S.C. § 2. Claims under Section 2 must allege: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). As elaborated by the courts, such a Section 2 violation must include "an element of anticompetitive *conduct*" (*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)) which "is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007); *see also Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000); 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651a (4th ed. 2015). Such anticompetitive conduct includes "tying," where "a seller exploits his dominant position in one market to expand his empire into the next" (*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)); and exclusive-dealing arrangements, which have the effect of "reducing if not practically eliminating additional competition." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452–53 (4th Cir. 2011). Both forms of anticompetitive conduct are established by the Complaint.

7

The Supreme Court has explained that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere . . . . When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 13 (1984). That is precisely what Viamedia alleges: that Comcast "force[d] a purchaser to do something that he would not do in a competitive market." *Id*. at 14.

As Comcast concedes, it controls the Interconnects in the Chicago and Detroit DMAs. Compl. ¶¶ 86–87. These Interconnects are vital conduits for Spot Cable Advertising in those markets. *Id.* ¶ 4. And Comcast has excluded competing MVPDs from this critical infrastructure, tying their reentry to their agreement to cede control of their advertising inventory to Comcast by using Comcast's subsidiary—and not Viamedia or some other firm—as their exclusive Spot Cable Advertising Representative. *Id.* ¶¶ 11–12. For example, Comcast conditioned WOW and RCN's reentry to the Chicago and Detroit Interconnects upon their acceptance of Comcast's Spotlight as their exclusive representative, *id.* ¶ 113, despite their concerns about the "obvious conflict and competitive disadvantage" such an arrangement imposed. *Id.* ¶¶ 108, 124–25, 133. That is unlawful: "the essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." *Times-Picayune Publ'g Co.*, 345 U.S. at 611.

In addition, Section 2 is violated when a defendant forces market participants into an exclusive (and thus exclusionary) contract that "intentionally, significantly, and without business justification excludes a potential competitor from outlets . . . where access to those outlets is a necessary . . . condition to waging a challenge to a monopolist." *LePage's Inc. v. 3M*, 324 F.3d

8

141, 159 (3d Cir. 2003).[2] And that conduct, too, is alleged in the Complaint: "Comcast has used its unilateral power to admit or deny competing cable television companies access to [Interconnects] and condition access to [Interconnects] upon those companies' exclusive use of Comcast Spotlight as their Spot Cable Advertising Representative." Compl. ¶ 2; *see id*. ¶¶ 12, 113, 124–25, 132–52.

Comcast's brief has nothing at all to say on these points; it makes no attempt to justify Comcast's exclusion from the Interconnects of MVPDs that obtain representation services from Viamedia. That failure is fatal to its motion. After all, these central elements of Viamedia's claim are not hidden in the interstices of the Complaint: they are stated clearly in the summary (*see, e.g.*, *id.* ¶¶ 2, 11–14) and repeated throughout the Complaint in the most express terms. If Comcast had a response, it had no excuse for failing to make its argument in its opening brief.

And in fact, any response would be futile. As noted above, the Seventh Circuit has acknowledged that use of "a monopoly in one market to foreclose competition in another" is "a classic violation of the antitrust laws." *Fishman*, 807 F.2d at 536. Here, Viamedia alleges in extensive detail how Comcast has wielded its exclusive control over the Interconnects—critical infrastructure for the Spot Cable Advertising market—to obtain and perpetuate a monopoly over the representation of other MVPDs by foreclosing competition from firms such as Viamedia. This is a paradigm example of unlawful monopolistic exercise of control, as effectuated by the very type of tying and exclusive dealing arrangements that have long been deemed violative of Section 2. *See*, *e.g.*, *United States v. Griffith*, 334 U.S. 100, 107 (1948) ("[T]he use of monopoly

---

[2] *See also du Pont*, 637 F.3d at 452–53 (defendant's exclusive contracts with major purchasers "severely limited" plaintiff from "competition for the most important customers in categories needed to gain a foothold for effective competition"); *LePage's*, 324 F.3d at 158–59 (3d Cir. 2003) ("dominant market player" induced customers into "dealing exclusively" with it "to avoid being severely penalized financially"); *UniStrip Techs., LLC v. LifeScan, Inc.*, 153 F.Supp.3d 728, 741 (E.D. Pa. 2015) (allegations of exclusive dealing contracts that conditioned benefit to customers on buying only from defendant were "plausibly indicative" of "willful attempt to maintain . . . monopoly power").

power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful."); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 251 (S.D.N.Y. 2004) (defendant used monopoly power in the transportation market "to break into the facilitation market by refusing to cooperate with [the plaintiff], and has thereby injured [plaintiff's] business").[3] Those principles require denial of Comcast's motion.

### B.    Under *Aspen Skiing*, Comcast's Refusal To Deal Is Unlawful.

The one argument that Comcast *does* make is wrong: in the circumstances here, Comcast's refusal to deal with Viamedia—that is, its refusal to allow Viamedia's customers access to Interconnects controlled by Comcast—violates the Sherman Act. Although Comcast surely is correct that not all refusals to deal are illegal, it is wrong in pronouncing flatly that it is "axiomatic that a firm has no legal duty to deal with its rivals." Def. Br. 7. To the contrary, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408. That is just what the Supreme Court held in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600–611 (1985). Here, the allegations reveal Comcast's course of conduct to be *more* "bold, relentless, and predatory" than that held unlawful in *Aspen Skiing*. 472 U.S. at 610. That is so for several reasons.

*First*, in *Aspen Skiing* "the monopolist elected to make an important change in a pattern of [conduct] that had originated in a competitive market and had persisted for several years," and that is "used in other [geographic markets] which apparently are competitive." *Id.* at 603. The same is true here. As alleged in the Complaint, Interconnects historically have been open to all

---

[3] It is instructive to compare this case with *Schor v. Abbott Laboratories*, 457 F.3d 608, 610–11 (7th Cir. 2006), which is cited but not discussed by Comcast. Def. Br. 2, 7. That case involved a "free-standing" Section 2 claim against a drug vendor for its use of monopoly power over one drug to gain a competitive advantage in the sale of other drugs by cutting its prices for such drugs. 457 F.3d at 610–11. The Seventh Circuit rejected this theory because the plaintiff did not allege that the vendor had engaged in related exclusionary conduct. *Id.* Here, in contrast, Viamedia expressly alleges exclusionary conduct by Comcast, including tying and coercing competitors into exclusive dealing and joint refusal-to-deal arrangements.

MVPDs and their representatives, and for good reason: more MVPDs in a given Interconnect means more households that advertisers can reach in a given DMA, raising the value of the Interconnect. Compl. ¶¶ 35–39. This likewise benefited competition, as the various MVPD members of the Interconnect continued to compete against each other for subscribers and advertising revenue. *Id.* ¶ 40. Comcast itself has admitted as much in the past. *Id*. ¶ 116. So here, as in *Aspen Skiing*, Comcast had "no valid business reasons for the refusal" to deal with its competitor. 472 U.S. at 605. Comcast does not even attempt to offer such a reason in its brief.

*Second*, "it is relevant to consider [the] impact [of Comcast's exclusionary conduct] on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605. In *Aspen Skiing*, the Court looked to the conduct's effect on the plaintiff; the superior quality of the product of cooperation between the plaintiff and defendant; and the defendant's dubious business justification for refusing to deal with the plaintiff. *Id.* at 605–11. Here again, it is clear on the face of the Complaint that each of those factors establishes the anticompetitive nature of Comcast's conduct, given its harmful effect on both Viamedia's role as a Spot Cable Advertising Representative and the ability of Viamedia's clients to compete with Comcast in the provision of cable television services. Compl. ¶¶ 1–2.

In this regard, Comcast's exclusionary behavior is *more* glaring than that in *Aspen Skiing*. The minority player in *Aspen Skiing* could still make attempts to compete after the dominant player's exclusionary conduct by marketing alternative and creative ski packages, with which "it tried to protect itself from the loss of its share of the patrons." 472 U.S. at 607. Here, in contrast, there is no alternative to the Interconnects, and Comcast's exclusionary conduct has foreclosed Viamedia from competing in the affected markets *at all*. Compl. ¶ 185. At the same time, Comcast's conduct also has made it impossible for its MVPD rivals to use their preferred

11

provider of representation services—instead requiring those rivals to use a subsidiary of their *competitor* (*i.e.*, Comcast Spotlight) to market their product. *Id.* ¶¶ 83, 128–29, 132–34. Comcast, which trumpets the antitrust principle that "promot[es] *competition*, rather than cooperation, among competitors" (Def. Br. 1), should recognize the danger posed by making Comcast the sole marketer of its rivals' products. As one rival MVPD succinctly put it: Comcast can "use its control to deny access to the interconnects to force smaller MVPDs to deal with Comcast Spotlight . . . or risk being excluded from the interconnect." Compl. ¶ 141.

*Third*, Comcast's attempts to distinguish *Aspen Skiing* are insubstantial. (a) Comcast maintains that Viamedia's access to the Interconnects was not terminated, but instead "expired" under the terms of the governing contract. Def. Br. 9–10. But this is semantic gamesmanship; the reality is that Comcast refused to renew the access of Viamedia's clients to the Interconnects, just as the dominant player in *Aspen Skiing* refused to renew the joint lift ticket at issue in that case. *See* 472 U.S. at 588–95. (b) Comcast maintains that its refusal to deal with Viamedia was not "'irrational but for its anticompetitive effect'" because Comcast has "declined to do business with [Viamedia] outside Chicago and Detroit" (Def. Br. 10), but this assertion assumes its conclusion; in each of these cases, it is evident that Comcast "elected to forgo . . . short-run benefits because it was more interested in reducing competition in the [affected] market[s] over the long run by harming its smaller competitor." *Aspen Skiing*, 472 U.S. at 608.[4] (c) Comcast addresses a red herring when it maintains that it may not be compelled "to deal with its competitor in perpetuity" (Def. Br. 11); exactly the same argument could have been made in

---

[4] Comcast engages in double talk when it says that its "electing to compete with Viamedia in Chicago and Detroit is not evidence of any 'anticompetitive' intent." Def. Br. 10. That is of course true, but it is not Viamedia's argument. The problem is not that Comcast competes for MVPD business; it is that Comcast used illegal methods to preclude that competition.

*Aspen Skiing*—and in any event, all Viamedia asks is that its customers be permitted to participate in the Interconnects on the same terms as all other MVPDs.[5]

In this regard, Comcast's characterization of the Complaint as resting on a simple failure to renew a contract is especially misleading. Def. Br. 1–2. Even assuming that the cited contract is properly before the Court,[6] that contract is immaterial because the right of access to the Interconnects *was not purely contractual*. As the Complaint alleges, the Interconnects have historically been "open to all MVPDs and their representatives," Compl. ¶ 38, and, prior to the exclusion of Viamedia's MVPD clients, no third-party representation firm or MVPD had *ever* been removed from any Interconnect for any reason. *Id*. ¶ 116. In fact, Comcast carefully avoids stating that Viamedia's MVPD clients' ability to *use* the Interconnects depended upon the contract itself; rather, it argues that the contract "sets forth the *terms*" of Interconnect access. Def. Br. 5 (emphasis added). Comcast's unilateral decision to refuse to renew such access *under any terms* and to wholly cut Viamedia's MVPD clients out of the Interconnects is a separate matter. And although Comcast argues that the contract permitted it to compete for Viamedia's MVPD clients, it does not and cannot argue that the contract permitted Comcast to use its control

---

[5] Comcast's assertion that Viamedia is responsible for the refusal to deal because it "declined to deal on the terms offered by Comcast" (Def. Br. 11) is insubstantial. The Complaint alleges that this offer was a sham (Compl. ¶¶ 122–23), a characterization that the Court must treat as true on a motion to dismiss.

[6] The contract was not attached to or mentioned in the Complaint. Courts in this district are "precluded from considering . . . any evidence outside Plaintiffs' complaint that is not referred to in the complaint and central to the claim." *Conley v. Nestle USA, Inc.*, 2011 WL 332525, at *4 (N.D. Ill. Jan. 31, 2011); *see also Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (noting that exception for consideration of such "*central*" evidence "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment"). Comcast nevertheless contends that the Court may consider this contract because the Complaint "refers to [the contract's] end date" and because "it is central to Viamedia's allegations." Def. Br. 5 n.3. But the Complaint does not refer to the contract's end date; it refers to the date on which Comcast unilaterally cut off Viamedia's access to the Interconnect. Compl. ¶ 110. For the reasons explained in the text, the contract is in no sense central to the Complaint.

over the Interconnects to effectively exclude Viamedia from the market.[7] Indeed, Viamedia specifically requested that its customers be readmitted to the Interconnects so as to allow for fair competition between Viamedia and Comcast Spotlight, and Comcast refused. Compl. ¶ 121.

### C. Viamedia Has Alleged Substantial Harm To Competition.

Comcast also briefly contends that Viamedia alleges no harm to competition, but "only harm to itself." Def. Br. 3; *id.* at 12–14. In particular, Comcast argues, because Viamedia does not allege "increased price or reduced output," it cannot possibly establish competitive harm. *Id.* at 13. But Viamedia has specifically and repeatedly alleged that Comcast has "harmed the competitive process" itself and has totally excluded competition, which is the definition of antitrust injury. *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 837 (N.D. Ill. 2004); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (antitrust injury reflects the "anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"); *United States v. Visa U.S.A.*, 344 F.3d 229, 240 (2d Cir. 2003) (finding injury due to "the total exclusion of [competitors] from a segment of the market").

Here, Comcast has harmed MVPDs by depriving them of "choice in their Spot Cable Advertising Representation," given that they understandably do not want to cede control over their Spot Cable Avails to Comcast, their largest competitor. Compl. ¶ 156; *see also id.* ¶ 2. And its conduct has "stifl[ed] competition in the Spot Cable Advertising Representation market" (*id.* ¶¶ 83–84), foreclosing competition from Viamedia and *all other firms* that compete with

---

[7] In this light, this case looks nothing like the various contract-based cases Comcast invokes. For example, the contract here contained no "restrictive covenant," the exercise of which "terminat[ed] the plaintiff's right to operate." Def. Br. 11 (citing *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009)). Nor are Viamedia's claims anything like the purportedly "comparable claim" for refusal to deal that Comcast defeated earlier this year. *See WHDH-TV v. Comcast Corp.*, 2016 WL 2858780 (D. Mass. May 16, 2016). There, the plaintiff's contract with Comcast is what established its ability to *exist* as the local affiliate of NBC, a broadcast network Comcast owns; Comcast simply refused to renew the contract and made plans to replace the plaintiff with its own affiliate. *Id.* at *3. That case involved none of the anticompetitive features, discussed above, that dictate the outcome here.

Comcast Spotlight. Although Comcast contends that MVPDs such as WOW and RCN "now *have access* to Comcast-managed Interconnects," Def. Br. 13–14, that declaration wishes away the competitive harm: WOW and RCN regained access only after Comcast deprived them of any choice in their advertising representative. *See* Compl. ¶ 151.[8]

### D. The Complaint Has No "NCC Claim" And Presents No Ripeness Concerns.

Comcast also briefly argues that Viamedia's "NCC Claim" lacks ripeness because Viamedia's access to NCC does not expire until December 2017. Def. Br. 12. But there is no "NCC Claim" in the Complaint, which describes Comcast's conduct relating to NCC as part of its overall course of anticompetitive conduct. Compl. ¶¶ 164–82. Thus, Viamedia alleges that Comcast instructed NCC not to renew Viamedia's NCC access, creating uncertainty about Viamedia's position that Comcast has used to harm its business. *Id.* ¶¶ 143–53. This is actual harm to competition that has occurred and is indicative of Comcast's pattern of conduct. Insofar as Comcast questions the relevance of these allegations, such an argument is inappropriate on a motion to dismiss. *See Armstrong v. Daily*, 786 F.3d 529, 546–47 (7th Cir. 2015).

## II. Viamedia Has Stated Viable Claims Under State Law.

For all the reasons the Complaint states claims under the federal antitrust laws, it similarly states claims under the antitrust laws of Illinois, Michigan, and Connecticut. *See* Compl. ¶¶ 183–215. And Comcast's motion does not challenge the validity of Viamedia's remaining state law claim for tortious interference with a business expectancy. *See id.* ¶¶ 216–23.

### CONCLUSION

For the foregoing reasons, Comcast's motion to dismiss should be denied.

---

[8] Comcast also argues that Viamedia does not have "standing to assert claims based on any alleged harm to MVPDs." Def. Br. 13 n.7. But Viamedia is not attempting to recover damages suffered by the MVPDs. Rather, Viamedia alleges that Comcast's behavior has harmed the marketplace, given that MVPDs were forced from the Interconnects and let back in only upon agreeing to drop Viamedia. Compl. ¶¶ 2, 76, 156.

Dated: August 19, 2016

Respectfully submitted,

/s/___Britt M. Miller_____
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312.782.0600
Facsimile: 312.701.7711
bmiller@mayerbrown.com

AND

Mark W. Ryan (*pro hac vice*)
Sean P. McDonnell
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20001
Tel: 202.263.3000
Facsimile: 202.263.3300
mryan@mayerbrown.com
smcdonnell@mayerbrown.com

*Attorneys for Plaintiff Viamedia, Inc.*

16